## Jacob Haish

### v.

### John W. Munday et al.

1.  Evidence.—In the examination of witnesses, counsel are prohibited, even upon cross-examination, from assuming any material facts in issue, and which are to be found by the jury, or from assuming that particular answers have been given contrary to the facts.

2.  Quantum meruit for professional services—Province of jury.—In a suit for professional services, upon a *quantum meruit*, no specific remuneration having been agreed upon, it is the province of the jury to determine the amount, and they are not bound or necessarily controlled by the opinions of attorneys as to the value of such services, but such opinions are to be regarded merely as facts in the c se to be considered by the jury in connection with the other facts and circumstances in evidence.

3.  Facts to be considered in fixing value of such services.—The professional skill and standing of the person employed, his experience, the nature of the controversy, both in regard to the amount involved and the character and nature of the questions raised in the case, as well as the *result*, should all be taken into consideration in fixing the value of the services rendered.

4.  Meaning of term result—Ultimate benefits not to be considered.—The "result," as mentioned *supra*, means the way in which the litigation terminated, and not that the party performing the services may trace out ultimate benefits to his client with the view of enhancing the value of his services.

5.  Hypothetical question.—The hypothetical question given in this case, was improper, as it assumed material facts in issue which were to be found by the jury and traced out ultimate benefits to the client.

Appeal from the Superior Court of Cook county; the Hon. Rollin Williamson, Judge, presiding. Opinion filed January 30, 1883.

This was an action by the appellees, Munday, Evarts and Adcock, attorneys, against the appellant, Haish, a manufacturer of barbed wire for fences, to recover upon a *quantum meruit* for professional services rendered by the former for the latter, in the defense of two certain suits brought against Haish in the United States Circuit Court for the Northern District of Illinois, concerning the validity and infringement

of certain patents for the making such wires, wherein Haish was defeated, and then, in preparing a certain agreement for a compromise between him and his adversaries. The declaration was in the common counts in this present suit to which the defendant pleaded the general issue. On the trial before a jury the plaintiffs gave evidence tending to show a retainer of them by the defendants, and the nature and character of the said suits, the probable amount involved, and the questions raised therein; also the services performed by them in said suit, as well as in preparing such agreement for a compromise between the defendant and the complainants in said suits against him in the federal court.

The court permitted the plaintiffs against the objections of defendant, to give evidence tending to show that the same complainants in the federal court had brought similar suits against some twelve other persons, in respect to violations by them respectively of such patents; that many of those individuals entered into a compromise with said complainants, and became licensees under them; and that the terms of defendant's compromise were much more favorable than those on which those other individuals settled; and also to give evidence tending to show what special benefits resulted to the defendant, by reason of the agreement of compromise, which plaintiffs prepared, and which, as they claimed, they were instrumental in having executed, together with the probable gains and profits which defendant might realize if he continued to manufacture such barbed wire, under the license of the said complainant, the Washburn and Moen Manufacturing Co. v. Elwood, and the provisions of said compromise, for the period of fourteen years, which was estimated in figures at $1,120,000. The court also permitted the plaintiffs' counsel against the objection of the defendant, to put to six several attorneys who were called on behalf of plaintiffs, to testify to the value of their services, and which was read over to each of said witnesses, the following so-called question:

" I will put to you the following hypothetical question: This is a suit brought by John W. Munday, Edward S. Evarts,

and Edmund Adcock, composing the firm of Munday, Evarts, & Adcock, of the bar of this city, against Jacob Haish, of De Kalb, to recover fees for professional services. Haish had been sued some time about the end of the year 1876, in the United States Courts of Chicago for an infringement of certain patents of barbed fence wire. Other parties being sued under the same patents, formed an association for their mutual defense, and retained Mr. George Payson, Mr. N. C. Gridley, and Munday, Evarts & Adcock as the counsel. Haish joined this union in April, 1879. The suits, fourteen in all, then went on together, and a very large amount of testimony was taken. They were all tried together before Judges Drummond and Blodgett. Argued at great length. Taken under advisement and a decision rendered some seven months thereafter, finding three of the plaintiff's patents valid, and all the defendants guilty of infringement, including Jacob Haish. A petition for a rehearing was presented by the other defendants, but in this Haish did not join. He had received assurances, as he supposed, from one of the patentee's attorneys, that he should not be in any way molested; that he should pay nothing for the past, and have a free license for the future. He accordingly refused to apply for a rehearing, and at the request of the patentee's attorney, he wrote him a letter that he wanted no rehearing. He went in person to Judge Drummond, and told him the same thing, and finally stood up in open court and publicly stated to the court that he was content with the decision then drawn, and was willing to have it entered against him. He also used his influence with the other defendants to settle, which they all finally did. But in his applying to the patentees to carry out their supposed agreement with him, he was told that they had made him no such promises, and that he could have no better terms than the rest. This he was disinclined to accept, and a few days thereafter, in January, 1881, he retained Munday, Evarts & Adcock, who advised him to carry on the litigation in his own name alone. That the injunction could probably be prevented, and his business held together until the Supreme Court could be reached, when the decision could probably be reversed.

" Mr. Geo. Payson was then retained with them to act as counsel. The services in question began with the retainer of Munday, Evarts & Adcock, as above.

" Mr. Haish then had three hundred thousand dollars invested in his business of making barb fence wire. These gentlemen, having accepted his retainer, at once went to work, Mr. Payson, and Munday, Evarts, and Adcock, to see if they could not get a hearing, or, if they failed in that, then to prevent an injunction. The court did allow them to re-argue the cases, and then held that only two of the plaintiff's patents had been infringed by Haish.

" The next question was whether Haish should be enjoined. This matter was also argued at length by eminent counsel for the patentees, and by Mr. Payson and Mr. Munday for Haish, and the court finally decided that no injunction should issue, provided he paid into court every month to await the final result of the suit seventy-five cents for every hundred pounds; the same as had to be paid by the regular licensees under the patents.

" Negotiations for a settlement which had been previously broken off, were now renewed by Mr. Thurston, the leading counsel for the patentees, immediately after leaving the court room, but still without success; the patentees not being willing to offer Mr. Haish such terms as he or his counsel were ready to accept.

" The accounting before the Master now began.

" The next step taken by the patentees was to prosecute a suit against one of Haish's customers, in the State of New York, they having threatened to sue all of his customers. Thereupon a petition was prepared by Munday, Evarts & Adcock, and presented by them with argument to Judge Drummond, for the purpose of preventing the patentees from going on with said suit. Judge Drummond intimated so clearly in his opinion that Haish's customers should not be interfered with in any way, that nothing more was done in that suit, and negotiations for a settlement with Haish were immediately reopened by the patentees. After long and repeated consultations, Haish's counsel striving all the time to

secure for him the most favorable terms, encouraging him to hold out, and at the same time advising him to settle whenever he could do so on the proper terms. A settlement was at last perfected, and finally the papers thereof, involving the consideration of many different questions, were fully executed and delivered under the advice of Munday, Evarts & Adcock, on behalf of Haish, and the counsel for the patentees on their part.

"By this settlement Mr. Haish secured the following advantages:

"1st.  He is relieved from all claim for past infringement, amounting, according to his own estimate, to $107,000.

"2d.  He is allowed to withdraw the sum of $25,000 in cash, deposited by him in court.

"3d.  He received from the patentees $10,000 in cash.

"4th.  He obtains a license under all their patents for fourteen years, the same as all their other licensees, with the following important differences, that is to say: He obtained the right to make 10,000 tons of barb wire, for each year during the fourteen years; whereas, the utmost they had before been willing to offer him was 4,000 tons.  On the first 4,000 tons he pays no royalty; whereas, on the terms before offered him he would have to pay seventy-five cents per hundred pounds, or $60,000 a year on 4,000 tons.  On the next 4,000 tons he pays only fifty cents a hundred instead of seventy-five cents, making a further difference in his favor of $20,000 a year, or, in all, a difference in his favor of $80,000 a year, or $1,120,-000 for the whole fourteen years, if the business should continue so long, and he continue to manufacture at that rate, and on those terms and prices; a difference which he would have to pay under like circumstances, had he got no better terms than those previously offered.

"On this supposed state of facts, what in your opinion, would be a fair and reasonable and usual or customary compensation for the services of these plaintiffs herein, Messrs. Munday, Evarts & Adcock, Mr. Payson being associated with them as counsel, and taking part in most of the matters herein named?"

To this question the several attorneys answered, giving their

opinions, ranging from twenty to ten thousand dollars.  The jury by their verdict found for the plaintiffs, and assessed their damages at eight thousand one hundred and forty-three dollars, for which the court, overruling the defendants' motion for a new trial, gave judgment, and the latter prosecutes this appeal.

Mr. FRANK J. SMITH, for appellant; that admissions of a party to a fact, no matter how or when made, are admissible against him, cited Robbins v. Butler, 24 Ill. 427; Greenleaf on Evidence, § 212.

Communications made to an attorney, in the character of a legal adviser are to be protected as the privileges of the party asking the advice: Shufeldt v. Barker, 56 Ill. 300; Greenough v. Gaskell, 1 M. & K. 102; Weeks on Attorneys, § 143.

The value of services is entirely detached from the consideration of their *ultimate benefit* to the person rendering them: Robbins v. Harvey, 5 Conn. 341.

It is not competent to ask the opinion of witnesses in such a way as to have it cover the very question to be found by the jury: C. R. I. & P. R. R. Co. v. Moffitt, 75 Ill. 524; C. & A. R. R. Co. v. C. & M. W. R. R. Co. 67 Ill. 142; Dorsey v. Corn, 2 Bradwell, 533; Reynolds v. Mac Millan, 63 Ill. 46; Eggleston v. Boardman, 37 Mich. 14; Vilas v. Downer, 21 Vt. 419.

An attorney can not recover for services rendered as such, unless he can show an employment or retainer: C. St. Charles & Miss. R. R. Co. v. Larned, 26 Ill. 218; Wails v. Succession of Brown, 27 La. An. 411.

It is allowable for an attorney to charge but one retainer: Schnell v. Schlernitzauer, 82 Ill. 439.

Mr. WILLIAM H. KING and Mr. FREDERIC W. PACKARD, for appellees; that in a suit by an attorney against his client for fees, the rule prohibiting revelation of privileged communications does not apply, cited Mitchell v. Bromberger, 2 Nev. 345; Rochester City Bank v. Snydam, 5 Howard P. R. (N. Y.) 254; Weeks on Attorneys at Law, 283.

Haish v. Munday et al.

The case was fairly submitted to the jury under the instructions, and the finding of the jury should not be set aside: C. B. & Q. R. R. Co. v. Lee, 87 Ill. 454; Addems v. Suver, 89 Ill. 482; Newkirk v. Cone, 18 Ill. 454; Conn. M. L. Ins. Co. v. Ellis, 89 Ill. 516; Wiggins Ferry Co. v. Higgins, 72 Ill. 517 ; Hayes v. Houston, 86 Ill. 487; Lewis v. Lewis, 92 Ill. 237; Crist v. Wray, 76 Ill. 204; Schmidt v. Sinnott, 103 Ill. 168; Peoria, A. & D. R. R. Co. v. Sawyer, 71 Ill. 363; Carpenter v. Hadden, 82 Ill. 265; Creote v. Willey, 83 Ill. 444; Williamsburg City Ins. Co. v. Cary, 83 Ill. 453; Carpenter v. Davis, 71 Ill. 395; Wheeler v. Shields, 2 Scam. 348.

The affidavits of jurors or outside persons as to facts derived from jurors, can not be admitted to impeach the verdict: Bertholf v. Quinlan, 68 Ill. 297; Nicolls v. Foster, 89 Ill. 386; Martin v. Ehrenfels, 24 Ill. 189; Allison v. The People, 45 Ill. 37; Reins v. The People, 30 Ill. 256; Smith v. Eams, 3 Scam. 76; Forrester v. Guard, Breese, 44.

McAllister, J. The rules of law which govern in the examination of witnesses as effectually prohibit counsel from assuming in their questions any facts which are material to the point of the inquiry, but which are to be ultimately found by the jury, as other rules of law forbid the presiding judge from assuming such facts in his instructions to the jury. In the former case, the reason of such rules does not rest merely upon the consideration that such assumption of facts might mislead the witness, but upon that of the liability of such assumption or assertion of facts by counsel becoming a substitute in the minds of the jurors for evidence, and thus calculated to mislead them. In the latter case the reason is the same, with the further reason that the assumption by the court in its instructions to the jury of material facts to be found by them, is regarded as an invasion by the court of the peculiar province of the jury. The rules in the former case are so rigidly maintained that they will not permit counsel, even upon cross-examination and when leading questions may be put, to assume any material facts in issue and which are to be found by the jury, or to assume that particular answers have

been given contrary to the fact: 1 Starkie on Ev. *p. 188; The People v. Mather, 4 Wend. 249; 1 Greenlf. on Ev. § 434.

Keeping in view the rules above referred to, we can scarcely conceive of a more glaring error than was committed in the court below, permitting the plaintiffs, against the objection of the defendant, to read to each one of the six attorneys called by the plaintiffs to testify to the value of their services, the so-called hypothetical question, which was of a length sufficient to fill two pages and a half in any of our standard law reports, of a structure wholly incompatible with any conception of a proper hypothetical question, because it was replete with absolute assertions of facts, and even extended into the domain of pure speculation. The great body of it seems to us to have partaken far more of the character of a high-sounding prologue than of that of a plain, simple, comprehensible question to be put to a witness, even though a lawyer, in a trial before a jury. It not only abounded with strong adjectives, with now and then a rhetorical expletive, but embodied a rather vigorous argument to prove the magnitude of the victory, which the plaintiffs had won for the defendant; his immediate gains, his rescue from impending perils, the superior advantages which he thereby acquired over other persons, with whom he had no connection; a victory, whose stupendous results to the defendant, the argument traced down through the next succeeding fourteen years of the uncertain future, showing that the defendant might realize, as a crowning result of the plaintiffs' services, the great sum of one million one hundred and twenty thousand dollars, if he would but attend to his business during that time.

That composition, so made up, and evidently prepared beforehand, with study and deliberation, was read over six times in the hearing of the jury. But counsel for the plaintiffs below, on argument here, strenuously insisted that the judgment ought to be affirmed; and when we told them that said so-called hypothetical question was clearly improper, they then replied that it was addressed to intelligent lawyers, and that all of them, but one, expressly excluded from their opinions the objectionable matter; that, therefore, if wrong,

it could do no harm.  That argument is based on the assumption that the jury should fix the amount of the plaintiffs' compensation solely upon the average result from the opinions given by the several attorneys.  Such is not the proper view. When the plaintiff sues for services, upon a *quantum meruit*, no specific remuneration having been agreed upon, the amount is of course a question for the jury.  3 Starkie on Evidence, *p. 1307.  In determining that amount the jury are not bound, or necessarily controlled, by the opinions of the attorneys as to the value of the services, but such opinions are to be regarded merely as facts in the case, to be considered by the jury in connection with the other facts and circumstances in evidence.  Rose v. Spies, 44 Missouri, 20; Anthony v. Stinson, 4 Kansas, 211.

The prejudicial effect predicable upon the reading of the so-called hypothetical question half-a-dozen times in the hearing of the jury, consists in the tendency the performance had to mislead the jury as to what were the facts, and what elements they would take into consideration in fixing the amount of plaintiffs' compensation.  The inquiry was upon a *quantum meruit*, and it was not what benefits immediate and remote the defendant had derived from plaintiffs' services, but what was the general worth of those services.  Robbins v. Harvey, 5 Conn. 341.

The general rule is well stated in Eggleston v. Boardman, 37 Mich. 18, to the effect that the professional skill and standing of the person employed, his experience, the nature of the controversy, both in regard to the amount involved and the character and nature of the questions raised in the case, *as well as the result* should all be taken into consideration, in fixing the value of the services rendered.

The *result* as mentioned in that statement, means the way in which the litigation terminated; and not, that the party performing the services may trace out ultimate benefits to his client with the view of enhancing the value of his services.  The lawyer always claims, that, if he performs his services for his client with the requisite skill and diligence, he is entitled to the full customary charges, even though his client was unsuc-

cessful in the litigation, because he does not warrant success; and the law allows him to do so. So does the physician, though his patient dies. So when a person sells articles of merchandise, upon a *quantum valebant*, he is entitled to recover what they were reasonably worth at the time of the sale and delivery, although the goods were a dead loss to the buyer, there being neither fraud nor warranty on the part of the seller. This being so, is the law so inconsistent, that if a buyer of real or personal property employ a lawyer to draw the agreement, and advise as to its execution, the latter, in a suit to recover the general worth of his services, at the time they were rendered, may go into an inquiry respecting the immediate and remote benefits which the client derived, by means of such agreement? Can the physician, whose professional services are supposed to have saved the life of a successful business man, in an action upon a *quantum meruit* for those services, be permitted to make inquiry as to what his patient might acquire during the rest of his natural life, with the view of fixing the general worth of his services, at the time, and under the circumstances of their rendition? Shall he recover a handsome fortune for so curing a capable, successful patient, when fifty or a hundred dollars would be considered a fair compensation, if the patient had been poor and unsuccessful? So, coming down to the present case, can the plaintiffs, who have sued upon a *quantum meruit* for professional services in defending two suits, against the defendant in the federal court, the result of which was adverse to him; for professional services in preparing and advising about an agreement of compromise between their client and his adversaries, be permitted to go into the fields of speculation, as to how much agency their services in the suits had in superinducing the compromise, and then as to what immediate and remote benefit their client derived from such agreement of compromise, and would derive through a period of fourteen years, with a view to showing the general worth of those services, when rendered? The proposition seems to us, preposterous. For the errors pointed out, the judgment below must be reversed and the cause remanded.

                              Judgment reversed.